**SO ORDERED.**

**SIGNED** this 02 day of March, 2011.

_____
**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:

AMERLINK, LTD.,                                    CASE NUMBER: 09-01055-8-JRL
                                                   CHAPTER 7
    DEBTOR.


STEPHEN L. BEAMAN, TRUSTEE

    Plaintiff,

    v.                                             ADVERSARY PROCEEDING
                                                   NO. 10-00164-8-JRL
JOHN M. BARTH, JR. AND WIFE TRACY
M. BARTH; RICHARD B. SPOOR AND
WIFE WALTON SPOOR; JOHN M. BARTH
AND WIFE EILEEN M. BARTH; HARLINGEN
STABLES, INC.; TALL GRASS FARMS, INC.;
PRO-FORM CONSTRUCTION, INC.;
NATIONAL CONSUMER COOPERATIVE BANK;
THOMAS R. SLOCUM; TERRY CASTLE; STEVEN
J. GUGENHEIM; HORIZON TRUST &
INVESTMENT MANAGEMENT, N.A.;
JR INTERNATIONAL HOLDINGS, LLC; AND
CAPITAL COMMUNITY FOUNDATION, INC.,

    Defendants.

## ORDER

This matter came before the court on the motions to dismiss filed separately by each

named defendant. A hearing was held on January 25, 2011, in Raleigh, North Carolina. Prior to the hearing, Walton Spoor, Eileen Barth, Tracy Barth, and Horizon Trust & Investment Management, N.A. were dismissed from the adversary proceeding by consent order. John M. Barth, Sr. was voluntarily dismissed as to the thirteenth claim.

## PROCEDURE

The underlying bankruptcy was filed by the debtor under chapter 11 on February 11, 2009. On November 23, 2009, the case was converted to a case under chapter 7. Steven L. Beaman was duly appointed as the chapter 7 trustee. Subsequently, on July 23, 2010, the trustee filed a complaint, initiating this adversary proceeding. The complaint states thirteen specific claims for relief. Due to the complexity of the claims, the court will render decisions in multiple orders. This order will address claims eight and nine, Federal RICO and North Carolina RICO, respectively.

## BACKGROUND[1]

When the debtor was formed, defendant Richard B. Spoor ("Spoor") was the sole owner and shareholder of the corporation. AmerLink, Ltd. ("AmerLink") was in the business of log home manufacturing, e.g., processing logs into home kits and contracting for installation of homes. In the fall of 2006, groundwork was laid for the creation of an AmerLink employee stock option plan ("ESOP"). The ESOP was adopted on September 29, 2006, with an effective date of October 1, 2005. Horizon Trust & Investment Management, N.A. ("Horizon") acted as trustee for the ESOP. Eleven days prior to adoption of the ESOP, September 18, 2006, John M.

---

[1] These facts are a fair distillation of the complaint taken in the light most favorable to plaintiff. That said, the complaint is not a model of clarity as it does not always proceed chronologically, and it is not clear which defendants are implicated in the various counts.

Barth, Jr. ("Junior") was hired as President and CEO of the debtor. During this time, Thomas R. Slocum was a director and officer of the debtor, serving as the Vice President and Secretary. AmerLink's business records showed assets, property, and equipment valued at approximately $17,036,117.00 at the time of the ESOP adoption. The same records indicated long term liabilities totaling approximately $11,933,502.00. Retained earnings were $4,895,078.00.

On December 8, 2006, Pro-From Construction, Inc. ("Pro-Form") was created as a subsidiary of the debtor. AmerLink was the sole shareholder of Pro-Form. Shortly thereafter, on December 14, 2006, Spoor, as AmerLink's sole shareholder, reconstituted AmerLink's board of directors. Spoor was elected chairman of the board. Junior, Slocum, Stephen Gugenheim, and Terry Castle were also elected to AmerLink's board of directors on the same date. Gugenheim and Castle refer to themselves as the "outside directors" because they were not members of the board at the time the ESOP was created. On December 19, 2006, two separate entities, In The Woods, Inc. ("Woods") and Harlingen Holdings, Inc. ("Harlingen Holdings") were merged into the debtor. Spoor controlled both Woods and Harlingen Holdings at the time of merger. Less than a week later, on December 21, 2006, AmerLink adopted the first amendment to the ESOP. The effective date of the first amendment was December 30, 2006.

One day prior to the effective date of the first amendment, December 29, 2006, AmerLink and Pro-Form entered into a contribution agreement that provided for the transfer of assets from AmerLink to Pro-Form. In exchange for transferred assets, AmerLink received 100% ownership of Pro-Form. Thereafter, AmerLink transferred ownership of Pro-Form to Spoor; however, this is an area of ambiguity. To the best of the court's ability to decipher the complexity of interwoven transactions plead in the complaint, it appears Spoor took ownership

to Pro-Form through Harlingen Stables, Inc. ("Harlingen Stables"), a separate entity controlled by Spoor.  In addition to passing ownership of Pro-Form, AmerLink made continual monthly payments for antecedent debts on behalf of Harlingen Stables.  The same is true for a Spoor-owned corporation known as Tall Grass Farms, Inc. ("Tall Grass").

On February 12, 2007, Spoor transferred 49% of his shares in AmerLink to the ESOP. The ESOP purchased the stock for $13,250,000.00, evidenced by a promissory note in favor of Spoor (the "ESOP note").  On or about the same date, Capital Community Foundation, Inc. ("Capital"), a non-profit, also received shares of stock in AmerLink from Spoor. Capital sold the 17,177 shares of AmerLink stock to the ESOP for $350,000.00, evidenced by a promissory note. As a result of the Woods and Harlingen Holdings mergers, payment of debts on behalf of Harlingen Stables and Tall Grass, dealings with Pro-Form, and transactions with the ESOP, the debtor's balance sheet dated March 3, 2007 reflects assets of $12,612,328.00 and liabilities of $23,536,671.11.

Six months following the transfers of AmerLink stock, on August 7, 2007, AmerLink entered into three loan transactions with National Consumer Cooperative Bank ("NCCB"). Although the debtor's liabilities outweighed its assets, NCCB loaned a total of $13,000,000.00: $8,000,000.00; $2,000,000.00; and, $3,000,000.00, respectively.  From the loan proceeds, AmerLink paid the ESOP $4,719,370.36; which, the ESOP in return paid to Spoor on account of the ESOP note.  Spoor allegedly used this payment to fund a certificate of deposit in favor of NCCB; which, the bank required under the lending terms as security.

The following year, on September 15, 2008, Spoor and Junior formed JR International Holdings, LLC ("JR").  Under the operating agreement dated October 9, 2008, Spoor and Junior

4

were 50% owners of JR. In consideration for ownership, Spoor transferred his remaining 51% interest in AmerLink valued at $8,000,000.00 to JR. Junior, having no stock to transfer, agreed to pay an equal sum. Junior anticipated help financing the $8,000,000.00 from his father, John M. Barth, Sr. ("Senior"). Senior wrote a check to Junior in the amount of $300,000.00; however, no further financial assistance was provided.

The plaintiff contends that Spoor and Junior, aided by fellow board of director members and certain lenders, formulated an elaborate scheme to get Spoor out of AmerLink with as much money as possible. Under the plaintiff's theory, the ESOP is the linchpin, serving as a conduit to knowingly deplete the debtor's coffers for personal gain. With respect to the federal and state RICO claims specifically, the plaintiff asserts that Spoor, Junior, Gugenheim, Castle, Slocum, and Senior as a group constitute an enterprise as defined in 18 U.S.C. §1961(1)(4) and N.C. Gen. Stat. §75D-3(a); and, that the collective conduct of the enterprise, which was engaged in interstate commerce, evidences the common purpose to deprive the debtor of assets in order to enrich Spoor and position Junior to take over the debtor. In response, the defendants argue that the plaintiff fails to plead with particularity a relationship between separate acts which would establish a pattern, scheme, or ongoing fraudulent activity that caused proximate harm to the debtor.

## DISCUSSION

Pursuant to the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§1961- 1968, incorporated in chapter 75D of North Carolina's general statutes, it is unlawful for any person associated with an enterprise to conduct affairs through a pattern of racketeering. 18 U.S.C. §1962(c), N.C.G.S. §75D-4(2). Federal RICO includes in this prohibition the

5

additional element that the alleged enterprise must be engaged in interstate commerce. §1962(c). A pattern of racketeering as defined by both federal and state statutes requires at least two acts of racketeering activity. §1961(5), §75D-3(b). The term racketeering activity encompasses a series of predicate acts, including the four alleged by the plaintiff – mail fraud, wire fraud, fraud in the sale of securities, and fraud involving a case under title 11. §1961(1), §75D-3(c)(2). However, it is the *pattern* of racketeering activities, not just the existence, which is central to a claim under RICO. (Emphasis added)

The Supreme Court examined the meaning of "pattern" in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229. 109 S.Ct. 2893 (1989). Turning to the Oxford English Dictionary, the court noted that a pattern is an arrangement or order of activities; but, further noted that it was not the number of predicate acts, but the relationship the acts bear to each other which creates the pattern. Id., 492 U.S. at 238. Further examining legislative history, the court determined that to prove a pattern of racketeering a plaintiff must show related predicate acts, and that such acts "amount to or pose a threat of continued criminal activity." Id., 492 U.S. at 239. Although continuity of criminal conduct is not generally satisfied by acts which occur within a few weeks or months, once predicates are proved, the threat of ongoing activity may depend on a factual case-by-case analysis. Id. at 242.

In light of the Supreme Court's decisions, circuits, including the Fourth, have set about further defining what establishes a RICO pattern. The Fourth Circuit declines to apply a single "mechanical" test when determining the existence of a pattern, looking instead to particular contexts. Int'l Data Bank Ltd. v. Zepkin, 812 F.2d 149 (4th Cir. 1987). Expanding on the situational approach adopted by Int'l Data, the court stated:

> The existence of a pattern thus depends on context, particularly on the nature of the underlying offenses. Attention to the nature of the underlying offenses is necessary because the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine.

HMK Corp. v. Walsey, 828 F.2d 1071, 1074 (4th Cir. 1987). Predicate acts of fraud occurring over a period of seven years were not "above the routine" in Flip Mortgage Corp. v. McElhone, 841 F.2d 531 (4th Cir. 1988).

Flip Mortgage Corporation ("FMC") was a creditor of the computer servicing company SCS. Under the terms of their contract, SCS was obligated to remit 70 % of revenue from customer usage of a computerized mortgage system, which FMC and SCS jointly developed. However, directors of SCS, unhappy with the ratio of revenue split, falsified accounting records in an effort to deprive FMC of its full profit. Evidence before the court indicated that SCS began submitting false reports almost immediately after the contract was executed seven years prior. Although FMC properly alleged the necessary predicate acts, the court held that a RICO pattern was not sufficiently plead.

Reviewing its previous decisions, the Fourth Circuit noted that "this circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." Id., 841 F.2d at 538. In Flip, the court determined that although allegations pointed to distinct and separate fraudulent acts over a span of seven years, the acts were part of a single plan to deprive a single victim, FMC, of profit. Id. Specifically, the court held that the "unity and narrow focus of the scheme, [and] the fact that the planned injury was inflicted and suffered over a period of years cannot convert this single scheme into a pattern within the meaning of RICO." Id; See also, Tudor Assoc., Ltd., II By and Through Callaway v. AJ & AJ Servicing, Inc., 36 F.3d 1094 (4th Cir. 1994)(summary judgment in favor of defendant upheld on appeal as

7

a single scheme despite the fact that the scheme to defraud lasted over ten years and involved millions of dollars.)

Similar to the court's findings in Flip, this district recognized that separate acts of ordinary commercial fraud amounting to a single scheme do not support the finding of a RICO pattern. In Am. Bankers Ins. Co.of Florida, Inc. v. First Union Nat'l Bank of North Carolina, 699 F.Supp. 1174 (E.D.N.C. 1988), the plaintiff alleged that on multiple occasions it was fraudulently induced into issuing credit insurance that did not conform with underwriting guidelines. The court found that the inherent characteristics of the transactions were centered on a single business relationship involving only one alleged victim; and, therefore, "lack[ed] the scope and dimension necessary to form a RICO pattern." Id., 699 F.Supp at 1178. While noting that the conduct alleged was reprehensible, the court ultimately held that the plaintiff failed to satisfy the continuity plus relationship established in the Fourth Circuit.

After reviewing the complaint in the light most favorable to the non-moving party, the court is persuaded that, like Flip and Am. Bankers, this is a case involving a singular scheme. As alleged, the defendants' collective goal was to deplete AmerLink's resources for personal gain. The alleged facts highlight instances of separate conduct over a course of several years; however, the defendants' conduct, though distinct, appears to be in furtherance of one intended goal. Additionally, by design, AmerLink was the sole victim. Following the reasoning of this district and the Fourth Circuit, which interpreted and applied findings of the Supreme Court, a solitary scheme aimed at a single victim does not fit within the scope of a RICO pattern.

Based on the foregoing, the defendants' motions to dismiss are ALLOWED with regard to claims of Federal RICO and North Carolina RICO. Claims eight and nine are dismissed as to

all defendants in their entirety.

END OF DOCUMENT